### 7793

### DUNLAP v. ROBINSON.

REAL PROPERTY.—Verdict directed on grounds: (1) that those from whom plaintiff claimed held the land adversely long enough to presume a grant from the State, (2) that the only inference from the testimony is that the possession of those in whom defendants endeavor to show title was merely permissive, (3) they could not hold adversely on account of the minority of at least one of the plaintiffs, reversed, because: (1) it was disputed who held the land for twenty years and whether the possessions tacked would show continuous adverse possession for twenty years, (2) the party through whom plaintiffs claim was not sole owner of the land, (3) there was no new entry during the minority of any of the plaintiffs.

Before DEVORE, J., Fairfield, February term, 1910. Reversed.

Action by Joseph J. Dunlap *et al.* against Mittie Rebecca Robinson *et al.* Defendants appeal.

*Messrs. Ragsdale & Dixon,* for appellants.     *Mr. Ragsdale* cites: *Adverse possession to raise a presumption of a grant is an issue for a jury:* 4 Rich. 50; 40 S. C. 168; 48 S. C. 472; 65 S. C. 193; 86 S. C. 365; 2 Rich. 20; 5 Rich. 374; 11 Rich. 109; 16 S. C. 142; 53 S. C. 30; 1 Ency. 820, 9 Rich. Eq. 19.     *The possession must be actual:* McC. 280; 6 Rich. 92; Rice 10; 3 Rich. 101; 14 S. C. 596; 3 Strob.

501.   *Adverse possession is always for the jury:* McC. 268; 2 Bail. 321; 2 McC. 289.

*Messrs. DePass & DePass,* contra, cite: *At common law the personal property of the wife vested in the husband:* 15 Ency. 820; 2 Kent Com. 143; 1 Hill's Eq. 376; 4 DeS. Eq. 532; 1 Hill Law 191; 27 S. C. 429. *In such case equitable title should not be sent to jury:* 79 S. C. 473.

February 28, 1911.   The opinion of the Court was delivered by

MR. JUSTICE GARY.   This is an appeal from the ruling of his Honor, the presiding Judge, which directed the jury to render a verdict in favor of the plaintiffs.

The grounds upon which he based such instruction were: (1) That those from whom the plaintiffs derive their title held possession of the land adversely for a sufficient length of time to presume a grant from the State: (2) that the only inference from the testimony is, that the possession of those in whom the defendants endeavored to show title was merely permissive; and (3) that those in whom the defendants attempted to prove title could not hold the land adversely, so as to defeat the rights of the plaintiffs, on account of the minority of, at least, one of the plaintiffs.

The plaintiffs are the heirs at law of W. S. Dunlap, who departed this life, on the 30th of September, 1886.

The plaintiffs introduced in evidence a deed, executed by R. D. Dunlap on the 27th of March, 1867, and recorded on the 21st of March, 1868, purporting to convey the land in dispute, to his son W. S. Dunlap.

The testimony upon which the plaintiffs relied was contradicted throughout the trial, as we will proceed to show.

R. D. Dunlap and his wife went into possession of the land, about the year 1855 or 1860.   It was purchased from Michael Harmon, but the witnesses did not know, whether

the deed was made to R. D. Dunlap or his wife. R. D. Dunlap traded a negro woman belonging to his wife. in order to pay for the land. When they entered into possession of the land, they had the following children: W. S. Dunlap, Robert D. Dunlap, Jr., Elizabeth Dunlap, who married a Simpson, Rebecca Dunlap, who married a Dunn, and Sarah Dunlap, who never married. There was also another daughter, named Jemima, but as she did not remain on the land, it will not be necessary to refer to her. The husbands of Elizabeth Simpson and Rebecca Dunn were killed during the war between the States, and the widows moved back to their father's home, during the war, and remained there, together with their sister Sarah, until they died. Elizabeth Simpson died about the year 1892, Rebecca Dunn several years ago, and Sarah Dunlap just before the trial of this case. R. D. Dunlap, Sr., died about four or five years after the war and several years after the death of his wife. During the time the said sisters remained in possession of the land they received the rents, and there was testimony to the effect that they paid the taxes. There was testimony tending to show, that W. S. Dunlap remained on the land, only a few years after his father's death, and returned but a short time, before his own death, in 1886. There was testimony tending to show that the said sisters, after the death of their mother, claimed that the land belonged to her; and Elizabeth Simpson made a will in which she said: "I give, devise and bequeath my undivided interest, in and to the tract of land, I jointly inherited from my father R. D. Dunlap, deceased, * * * my portion of said land being 16 2-3 acres, more or less, unto Rebecca Jane Simpson, my daughter."

There was testimony, also, tending to show that Mittie R. Robinson, daughter of one of said sisters, has been in the actual possession of the land since the death of her mother, about twelve or fourteen years, before the commencement of this action.

It will not be necessary to refer to the oral testimony specifically, as the following letters tend to show, that W. S. Dunlap was not the sole owner of the land, and that the deed was only executed to secure him for money loaned, and supplies furnished his father. And that, as his brother Robert and the other members of the family did all they could for their father, he did not insist upon payment of the amount due him, but was willing for the land to be divided equally, between his sisters and his brother.

In a letter to his nephew, dated the 5th of March, 1882, he said:

"You asked me to explain the real truth about the place; the whole truth is, I paid my father more than one thousand dollars, one time and another, or I let him have money and supplies, from time to time, to that amount, and to keep me from losing anything, he (my father) gave me a warrantee title to his land.

"But Robert and the rest did all that they could for our father, too, and that being the case, I propose to divide the place equally with my sisters and brother. That would give each of us, one-sixth interest in the place; your mother-in-law has 1-6, Rebecca 1-6, Sarah 1-6, Robert 1-6, and sister Jemima's children 1-6.

"Now the very best way, that I can conceive for you all to do, is to agree where the boundary shall be, until such settlement can be had, that will give satisfaction. * * * Now, I have told you all about the place. Rebecca, Sarah and Lizzie may make any trade with you that they see fit; you may have my interest in the place, for one hundred dollars, if you can raise the money by the first of November next, which will take two bales of cotton or more. I know that there is not enough land for us all, and I will let them all do with theirs, as they like."

In a letter to his sister Elizabeth, dated 18th June, 1882, he said:

"I am not dividing the place as our father's property. It never was father's rightfully; it was mother's, and she wished one to have as much as another, and I wish to comply with her wishes, as far as I can. Nothing else in the world induces me to divide the place equally with you all but that. It was mother's property, and therefore every one should have their share, and it was her wish that it should be so."

In another letter to her, dated 16th October, 1882, he wrote:

"Bessie said in her letter that Robert proposed, that you buy him out there; she said that Robert proposed to take one hundred dollars for his interest there; give it to him."

He wrote as follows in another letter to her, dated 18th November, 1882:

"I will write to your Uncle Robert soon and tell him all about the settlement of the land matter; it must be closed out. I do not wish any hard feelings about the matter; there has already been too much hard thoughts, and words, too. More than several such places are worth, and especially by Robert. I do not wish him gone, but I would want any one gone, who makes so much disquiet, as he has done. He knows that none of us can raise one hundred dollars now, and if he does not sell his place on time he can keep it. I can't pay any cash on the place, and I know your mother can't, and he will not pay what he owes her. I will sell my interest for one hundred dollars, to any of you, and some of the others would do well to sell out too."

In a letter to her, dated 1st April, 1883, he said:

"Some of you who live there, on the old place, ought to buy Jemima's children's portion of the old place; any of you ought to be able to buy them out; I would if I was there, but as it is I can't."

He wrote to his brother on 5th August, 1883, as follows:

"You asked me what I would take for my interest there. I don't know how to offer it to you; I will sell, and reason-

able too; six dollars per acre is not unreasonable; father gave seven dollars per acre. I will give you $125 for your interests, and will take $100 for mine, fifty dollars on the 10th of November next and fifty twelve months after, one bale of cotton will pay the first payment, and fifty dollars at the expiration of twelve months."

Again he wrote his brother, dated 28th August, 1883. in which he said:

"Can you buy my part of the home place, and pay fifty dollars this fall; if so let me hear from you at once; I wish to make the trade at once, for the lot, and I want to make the first payment, as soon as possible."

In another letter addressed to his brother, dated 7th October, 1883, he wrote:

"Your proposition to send me fifty dollars November 15, 1883, and November 15, 1884, fifty more. So far as my interests are concerned, I will take fifty dollars 15th November, and fifty dollars twelve months thereafter, but I would not like to sell Jemima's children's part without consulting the children. I will do that. I will find out if they will sell their part soon. Willie Shurley said he had a notion to go to S. C. next winter. If he does go, perhaps he may prefer buying the other children's part; if so, let him have it; but if they wish to sell them, you can buy from them, and they may want their money before that time. But I will get it, on as easy terms as possible; I mean business, and you send me fifty dollars, you shall have a bond acknowledging your right, to hold and use the land."

Again he wrote, on 20th October, 1883, to his brother, as follows:

"You must not fail to write me, nor fail to send me fifty dollars on the 15th of next month; everything concerning my trade about the lot depends on my paying fifty or seventy-five dollars cash, and if you can't send the money, the trade can't be effected."

On the 27th of October, 1884, he wrote to J. M. Smith, his nephew, as follows:

"You ask, what is the least I will ask for my interest in that place; one hundred dollars will buy me out.  I have not had any rent or pay of any kind.  I could have got $125 at one time, but on account of my sisters I did not sell it.  I only want my own at reasonable rates, and if you buy me out, you must not inconvenience them, nor put any one there who will give them any trouble.  I think not of my own comfort entirely, but all I can do for my sisters, too, and that is only to dispose of that place so as not to disturb them."

He wrote to his sister Elizabeth on the 11th of January, 1885, as follows:

"You complained that I had not wrote, but I did write, and wrote to Robert, too, as to the question what I am going to do; with regard to the sale of that place, I am not prepared to say.  I therefore ask, what disposition you can make of the place, or how do you propose to dispose of it; all I want is my part, and see that Jemima's children get theirs.  I will take ($100) one hundred dollars for my part, and one hundred for Jemima's children's part; but the terms of the sale is a matter of importance, and one that I am not prepared to answer at present."

The first ground, upon which his Honor, the presiding Judge, directed a verdict cannot be sustained, for the reason that it was a disputed question whether either R. D Dunlap or W. S. Dunlap held the land adversely for twenty years; also, whether the possession of R. D. Dunlap, tacked to that of W. S. Dunlap, tended to show a continuous adverse possession for twenty years.

The second ground cannot be sustained, because the letters, alone, tend to show, that W. S. Dunlap was not the sole owner of the land.

The third ground cannot be sustained, for the reason that there was no *new* entry by the sisters during the minority

of any of the plaintiffs.    *Satcher* v. *Grice,* 53 S. C. 126, 31 S. E. 3; *Sutton* v. *Clark,* 59 S. C. 440, 38 S. E. 150.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court, for a new trial.